# Ettinger *versus* Commonwealth.

## Moyer *versus* Same.

## Erb *versus* Same.

1. Where an acccomplice to a crime testifies to the circumstances thereof, it is competent for the Commonwealth to verify as far as posible his statement as to the res gestæ by the testimony of witnesses who came upon the ground immediately after the occurrence and while the means of verification existed.   Nor is it necessary that such corroborative testimony should extend to the whole of the accomplice's testimony.   If it be shown that he has testified truly in some particulars, the jury may infer that he has done so in others.

2. Where a man at full liberty to speak, and not in the course of a judicial inquiry, is charged with a crime and remains silent, that silence is a circumstance which in certain cases may be submitted to a jury as evidence of guilt.

3. Where, on a trial for murder, there is evidence to prove motive on the part of the defendant, as well as actual participation in the crime, admissions made by him to the effect that he was asked to take part in the murder, but declined, promising, however, to say nothing about the matter, are relevant and competent evidence, as they tend to show that the defendant was at any rate an accessory before the fact.

4. In such case evidence of statements made by the defendant that a fire, alleged by an accomplice to have been kindled by the murderers at the time of the crime in order to conceal the traces thereof, was not accidental, and that he helped to cause said fire, is also admissible.

[Ettinger *v.* Commonwealth.]

5. On a trial for the murder of a woman, in a house where she lived, an accomplice testified that the defendant and others also murdered the woman's husband at the same time and place, and afterwards took and carried away money which was on the premises. *Held*, that in view of this testimony, evidence that the defendant knew of the existence of this money, and where it was kept, was admissible in order to show motive for perpetrating the crime.

June 13th 1881. Before SHARSWOOD, C. J., MERCUR, GORDON, PAXSON, TRUNKEY, STERRETT and GREEN, JJ.

WRITS OF ERROR to the Court of Oyer and Terminer and General Jail Delivery of *Snyder county:* Of May Term 1881, Nos. 92, 93, 94.

Emanuel Ettinger, Jonathan Moyer, Israel Erb, Uriah Moyer and Ellen Moyer were indicted for the murder of Gretchen Kintzler. Uriah Moyer and Ellen Moyer were not arrested. Separate trials were granted to each of the prisoners, all of whom pleaded not guilty. Each of the prisoners was found guilty of murder in the first degree, and they severally and respectively removed the records to this court by writ of error. The only specifications of error in each case were to the rulings of the court below upon the admissibility of certain evidence offered by the Commonwealth and objected to by counsel for the prisoners. The voluminous testimony in each case, as reported by the stenographer, was brought up with the records, but was not printed in full in the paper books. Portions of the testimony in the Ettinger case were printed, but in such a confused and erroneous manner as to prove untrustworthy and practically useless. In view of the gravity of the cases, the original testimony attached to the record was examined and considered by the court, but as it has been returned with the records to the court below, it is not available to the reporter. The separate opinions of this court (infra) recite the material portions of the testimony, the admission of which was assigned for error in each case; and the following condensed statement of the general facts proved in the cases, collated from the paper books on both sides, is deemed sufficient for an intelligent understanding of the points decided.

John Kintzler and Gretchen, his wife, were German people, who owned and lived in a one-and-a-half-story log house and a few acres of mountain land in a wild and secluded location in Adams township, Snyder county, Pennsylvania. They lived almost entirely to themselves, made no friends, and repelled social intercourse. They guarded their premises, which they scarcely ever left, by watch-dogs and firearms. They gained the reputation of possessing and hoarding money, which they

[Ettinger *v.* Commonwealth.]

kept in a box buried in the ground under where the bed stood, covered by a trap-door in the floor.

On Saturday night, December 8th 1877, their house was burned, which fact was first discovered between four and five o'clock on the following morning by Jacob Schraeder, their nearest neighbor on the east, who with members of his family immediately went to the spot. They found the house almost burned to the ground and saw part of the remains of two human beings lying in the fire. The remains of one were removed from the flames and recognized as the body of John Kintzler. The remains of the other could not be identified. The bones were collected and buried with the remains of the body of John Kintzler in a box. Certain indications negatived the theory that the fire was accidental and suspicion attached to Israel Erb, who was Kintzler's nearest neighbor on the west, and who was known to have had a grudge against Kintzler. Ettinger, Uriah Moyer, and one Bickhart were also suspected of complicity in the crime with Erb, and were arrested, but were discharged on habeas corpus for want of sufficient evidence against them.

About six months afterwards, in June 1878, Mary Hartley, a girl of about eighteen years of age, a native of that locality, well known to Ettinger, Erb and the Moyers, went to J. G. Moyer, a respectable storekeeper, and told him that she had something to tell him in private; that her mind was so disturbed that she could not rest until she told it; she then gave in detail the following statement,—which she subsequently testified to on the trials:

On the night of the 8th of December 1877, about nine o'clock, she started from the house of Jonathan Moyer, about three miles from Kintzler's, in company with Jonathan Moyer and his wife Ellen to go to the house of Israel Erb for the purpose of having Ellen Moyer measured for a pair of shoes; on the way, they met Uriah Moyer, who joined them. The party soon afterwards met Israel Erb in the woods near the Kintzler premises, who stated he was out coon hunting. After proceeding a short distance, they reached the fence of Kintzler's property. The men crossed the fence, telling the two women to remain at the fence, as Kintzler had cross dogs, and he might shoot. One of the men tied up one of the dogs, then kindled a fire on a flat stone in front of the door, and with an axe cut a hole in the door, reached in and unfastened it and went into the house. The witness and Ellen Moyer then crossed the fence and went to the house. Mary Hartley testified that she saw John Kintzler lying on the floor near the stove, and that she saw Ettinger strike old Mrs. Kintzler on the head with a club and she fell over on her back. Ettinger, Erb, and Jonathan Moyer then secured the

money-box from the hole under the floor, carried it out of the house, and by the light of burning pine divided the money. Ettinger and Jonathan Moyer then went to a small shanty used by the Kintzlers as a stable, carried leaves from the stable to the house, scraped up some of the blood from the floor into a piece of crock, and poured on the ground in the yard; then washed the crock and threw it into the woods. They then fired the house and the whole. party left. They reached Jonathan Moyer's about three o'clock on the morning of December 9, where they went to bed.

In order to corroborate the testimony of Mary Hartley, the Commonwealth caused to be exhumed and produced on the trial some of the bones, which had been buried, and called several physicians, who testified that one of them at least was that of a human being, which corresponded in size with the stature of Gretchen Kintzler, and that, from its ossified condition, it belonged to a person well advanced in years. It was in evidence that Gretchen Kintzler was a small woman, weighing about one hundred pounds, and was about sixty-eight years of age.

The Commonwealth also produced several witnesses, one of them a detective, and the others, fellow-prisoners of Ettinger, in the penitentiary, who testified that Ettinger made voluntary confession to them of the part which he took in the murder, and stated that Mary Hartley had previously sworn to the truth in all the details.

The particular testimony in each case, the admission of which forms the separate specifications of error, is fully referred to in the separate opinions of this court.

The three cases were argued together.

_A. H. Dill_ (with him _T. J. Smith_ and _J. M. Lynn_), for the plaintiffs in error.—The Commonwealth's evidence falls under two classes: 1. That of an accomplice, Mary Hartley. 2. Evidence claimed by the Commonwealth to be corroborative of Mary Hartley's testimony. Under the latter class falls the testimony of witnesses relating to the finding a spot of blood on the ground outside of the house and to finding pieces of the earthen crock in the woods, and to the alleged confession by Ettinger. We objected to the admission of such testimony, not because it may not have been evidence for some purposes, but because it was admitted for the express purpose of corroborating Mary Hartley, upon whose testimony alone the Commonwealth relied to prove the corpus delicti. We contend that the corpus delicti must be distinctly proved before evidence of confession is evidence of guilt, and that it should have been established independently of Mary Hartley's testimony, unless her testimony as to the fact

of the murder was corroborated by facts, directly connecting the prisoner with the crime. The testimony, the admission of which is complained of, was not corroborative of her testimony in this sense. The mere fact that a piece of crock was found in the woods and a spot of blood on the ground had no connection with the prisoner's alleged guilt. But the seemingly exact correspondence of physical appearance with Mary Hartley's description was calculated to mislead the jury on the vital point of the case—the corroboration of the witness's statement that the prisoners committed the crime. Evidence of corroboration should be of some fact existing entirely independent of the control of the witness, and not such as could be manufactured by a designing witness.

*H. H. Grimm*, District-Attorney, and *A. W. Potter* (*Charles Hower* with them), for the defendant in error.

Mr. Justice STERRETT delivered the opinions of the court October 3rd 1881.

ETTINGER *v.* COMMONWEALTH.

It was incumbent on the Commonwealth to establish the corpus delicti as well as the participation of the prisoner in the murder. A careful examination of the testimony returned with the record and referred to in the charge of the court leads to the conclusion that it was amply sufficient for both purposes. It was exclusively the province of the jury to consider the testimony, pass upon the credibility of the witnesses, and determine the truth of every material allegation on which the Commonwealth relied ; and, inasmuch as it was fairly submitted to them in a clear and comprehensive charge, to which no exception is taken, it must be conclusively assumed that all the ingredients of murder of the first degree were fully proved to the satisfaction of the jury. The testimony of Mary Hartley, the principal witness for the prosecution, was direct and positive, both as to the commission of the crime and the prisoners' active participation therein. After giving a somewhat detailed statement as to how the parties came together on the night in question and what occurred on the way to Kintzler's, she proceeded to state in her own way what took place there. The following is the substance of her testimony as to some of the more prominent facts. When they reached the fence east of the house the prisoner ordered her to remain there, saying that Kintzler had cross dogs, and if he was not in bed he might shoot. In company with his male companions he then crossed the fence, and after securing one of the dogs and tying him to a stake at the fence, he returned to the house. The witness afterwards heard a crash of broken

glass and saw the prisoner making a fire on a large stone in front of the house. He then drew from under his vest a short-handled axe with which the door was forced open and they all rushed into the house. In company with Ellen Moyer the witness then crossed. the fence, for the purpose of seeing, as she says, what was going on; and, on reaching the house she saw Mr. Kintzler lying on the floor near the stove and saw the prisoner strike Mrs. Kintzler on the head with a club, and knock her down, as she was attempting to escape. The box containing Kintzler's money was then secured, and, after dividing the contents by the light of a pine torch, they threw the box, together with some pennies, &c., back into the house. The prisoner then scraped some of the blood from the floor into a piece of crock, and after emptying it on the ground at the east side of the house, threw the crock into the woods towards Shrader's. The diabolical work was then completed by setting fire to the house, and all the parties withdrew. Such is the substance of the more prominent facts to which she testified, without attempting to give the language of the witness. Several witnesses were examined as to the condition of the premises next morning when the fire was first discovered. The house was then nearly consumed, and in the ruins several persons saw what they believed to be the remains of the old people. They were taken out and afterwards examined by experts and others who testified on the trial. The testimony on this subject is such as to leave no doubt as to their identity. · It was also shown that blood was found at the east end of the house, and some of the witnesses testified in regard to the hole, under the floor, in which Mr. Kintzler kept his money-box, and also as to where the dogs were found. In addition to this, it was shown that the prisoner, while in the Middleburg jail, admitted to Joseph Wagner that he helped to kill the Kintzlers; and after they were taken to the Eastern penitentiary he made a more detailed statement to Wagner, in which he said the old woman came running out and he knocked her down, and one of his companions killed her; " that they took the money out, carried leaves in, and set the house on fire," &c. Other testimony tending to prove the guilt of the prisoner was submitted the jury, but it is unnecessary to dwell further on the facts of the case. They have been sufficiently brought to notice to show that if the witnesses were believed by the jury, the verdict, both as to the prisoner's guilt and the grade of the crime, was fully warranted. The only question that is not conclusively settled by the verdict is, whether any of the testimony complained of in the assignments of error should have been excluded. Unless there was substantial error in that regard it is very clear that the verdict and judgment should not be disturbed.

[Ettinger *v.* Commonwealth.]

The first assignment relates to the admission of testimony to prove that at the morning after the alleged murder, a pool of blood was found at the east side of the house, where, according to the testimony of Mary Hartley, the contents of the broken crock had been emptied the night before. She had testified fully as to what had occurred on the night in question ; among other things, that the prisoner scraped some of the blood into a piece of crock, and emptied it on the ground at the east end of the house, so that the people might think the Kintzlers had been killed outside the house, and thus the probability of a search for their remains in the ruins would be lessened. In connection with other evidence, the testimony complained of tended to show that the condition of things on the night of the alleged murder, as testified to by Mary Hartley, was correctly represented by her, and thus, to some extent, her statement of what had occurred was verified by witnesses who visited the premises early next morning. On behalf of the prisoner it was urged that, according to her own version of the transaction, Mary Hartley was an accomplice, and, therefore, unworthy of belief. This was denied by the prosecution, but still it was a question for the jury to pass upon, and, in view of the circumstances, it was competent for the Commonwealth to verify as far as possible her statement as to the res gestæ. This was properly done by the testimony of witnesses who came upon the ground immediately after the occurrence, and while the means of verification existed. In the case of an acknowledged accomplice, it is well settled that corroboration need not extend to the whole of his testimony. If it is shown that he has testified truly in some particulars, the jury may infer that he has done so in others. We think, therefore, that the testimony was not incompetent for the purpose for which it was admitted.

In his instructions to the jury, as to the effect of Mary Hartley's testimony, in case they found she was an accomplice, the learned judge gave the prisoner the full benefit of the law, and even more, by saying : "The practice is well settled that no conviction shall be had upon the unsupported testimony of an accomplice." This statement of the rule is not strictly correct, in theory at least. The degree of credit that should be given to an accomplice, is a matter exclusively within the province of the jury. It is competent for them to convict on his uncorroborated testimony, but the source of such evidence is so corrupt that it is deemed unsafe to rely upon it alone; and hence it is the practice of courts to admonish the jury of the danger and advise against a conviction on the testimony of an accomplice, unless he is corroborated to some extent, especially as to the person of the party he accuses : Watson *v.* Commonwealth, 28

[Ettinger v. Commonwealth.]

Pittsburgh Leg. Jour. 89. The principle which allows the testimony of an accomplice to go to the jury for their consideration, necessarily involves the right to believe and act upon it. The general rule appears to be that, notwithstanding the admonition and advice of the court, the jury may, if they see fit, act upon the evidence of an accomplice, and convict without any corroboration of his statement, but in practice such a thing seldom occurs.

The second assignment is not sustained. Mary Hartley testified that after the murder the prisoner and one of his companions crawled under the bed and brought out the box containing the money. It appeared, by other testimony, that in the ground immediately under the floor where the bed stood, there was a hole in which the box was secreted, and that access to it was had through a trap-door in the floor at that place. Several witnesses had testified, without objection, to having seen the hole on the morning after the fire and subsequently; and then the witness, Mr. Smith, was called to prove that he was there about two months after the occurrence, and the hole was still visible. The objection was not to the character of the testimony, but that in point of time it was "too remote to furnish any evidence of corroboration." The learned judge in overruling the objection remarked that testimony had been given of the existence of the hole at the time of the fire and for some time after; and that the witness was competent to speak of its being there for a period of two months afterwards; and, though the evidence was very slight, he thought it a circumstance for the jury. There was nothing wrong in this. The objection to the offer was groundless, and there was no error in overruling it.

The testimony, to which the third assignment relates, was admitted, as the learned judge says in his ruling, on the authority of the principle stated in Wharton's American Law, and cases there cited, viz.: "When a man, at full liberty to speak and not in the course of a judicial inquiry, is charged with a crime and remains silent, that is, makes no denial of the accusation by word or gesture, his silence is a circumstance which may be left to the jury." The testimony shows that on several occasions when they were together in the Eastern penitentiary the witness accused the prisoner of killing the Kintzlers, and the latter made no reply. The circumstances under which the accusation was made were so well calculated to elicit a reply that we are not prepared to say that the silence of the prisoner was not a circumstance, though very slight, for the consideration of the jury. Silence, under certain circumstances, may amount to a tacit admission of guilt. It is said in Roscoe's Criminal Evidence, *54: "Besides the proof of direct confessions, the

[Ettinger *v.* Commonwealth.]

conduct or demeanor of a prisoner on being charged with the
crime, or upon allusions being made it, is frequently given in evi-
dence against him." The Commonwealth had proved that on a
previous occasion, when in company with Joseph Wagner and
others in the Middleburg jail, the prisoner expressly admitted
to Wagner that he helped to kill the Kintzlers. This was
proved by Wagner, who also testified that he then told him " he
had better keep his mouth shut, that the sheriff might hear."
On that occasion the witness, Thomas Jordan, was present as a
fellow prisoner in the jail, but it appears from the testimony
that he was then asleep and did not hear the admission testified
to by Wagner. Again, after the prisoner, Jordan and Wagner
were taken to the Eastern penitentiary, there was, according to
Wagner's testimony, another conversation, in which he repre-
sents the prisoner as saying that : " as soon as they came to
the house he threw in chloroform and with the same axe he
stole across the mountain he cut the door open. He went in
then and Kintzler got up and he knocked him down, and old
Erb killed him, and the old woman came running out and he
knocked her down and Jonathan Moyer killed her. He said
that he knocked down both of them, but he did not do it to
kill them. Then he told me that they took the money out and
carried leaves in and set the house on fire and burnt it, and then
they divided the money and went home." This is an extract
from the testimony of Wagner as we find it in the official report
of the evidence. It appears that the Kintzler murder was the
subject of conversation and accusation while the parties named
were fellow-prisoners in jail and afterwards in the penitentiary.
The credibility of the witness was for the jury, and we see no
impropriety in admitting testimony as to what was said and
done by the prisoner in relation to the subject. His admissions,
and his conduct when accused of participation in the murder,
were, under the circumstances, competent evidence.

The fourth and fifth assignments may be considered together.
They relate to the finding of pieces of crock in the woods
where Mary Hartley testified the crock was thrown on the
night of the murder, and present substantially the same
question that is raised by the only assignment of error in
Moyer *v.* The Commonwealth, just decided. For reasons
given in the opinion filed in that case the assignments are not
sustained.

The testimony complained of in the two remaining assign-
ments was not improperly admitted. Neither of these assign-
ments requires special notice. They are not sustained.

After a careful examination of the record, including the
official report of the testimony returned therewith, we have

failed to discover anything that would justify a reversal of the judgment which was pronounced after a full and fair trial.

Judgment affirmed, and it is ordered that the record be remitted to the Court of Oyer and Terminer of Snyder county for the purpose of execution.

## . Erb v. Commonwealth.

The prisoner was indicted jointly with four others for the murder of Gretchen Kintzler, alleged to have been committed in December 1877, and on a separate trial was found guilty of murder of the first degree. The case was fairly submitted to the jury in a clear and comprehensive charge to which no exception was taken. It must be conceded that the testimony before the jury fully justified their verdict. The only ground of complaint is that the court erred in admitting certain items of testimony specified in the assignments of error. Unless there was manifest error in that regard there is nothing that would justify a reversal of the judgment after a full and fair trial, such as appears to have been accorded to the prisoner in this case. The evidence of his guilt was direct and positive, as well as circumstantial, and it was· the special province of the jury to pass upon it and declare by their verdict whether he was guilty or not. If they believed the witnesses for the Commonwealth,— and it must now be presumed they did,—they could have no reasonable doubt of his guilt. .

The testimony complained of in the first assignment, was admitted for the purpose of corroborating the statement of Mary Hartley, the principal witness for the Commonwealth, in regard to the piece of crock alleged to have been thrown over into the adjoining woods on the night of the homicide. She had testified that immediately after the Kintzlers were murdered and the money divided, one of the parties, who actively participated in the felony, scraped some of the blood from the floor into a piece of red earthen crock, and having emptied the same on the ground at the east end of the house, threw the crock over an apple-tree into the woods adjoining the premises. It was proved by several witnesses that blood was found next morning where Mary Hartley said it had been emptied, and in further corroboration of her statement the witness A. K. Gift was permitted to testify that he made search at the point indicated by her testimony and there found several small pieces of crock which fitted together and had evidently formed a larger piece, corresponding in kind with that mentioned by her. Throughout the trial the credibility of Mary Hartley was assailed by the prisoner on the ground that, according to her own version of the transaction, she was an accomplice in the crime, if any was com-

[Erb *v.* Commonwealth.]

mitted. This was one of the questions which the jury had to consider, and in view of all the circumstances we cannot say the testimony was improperly admitted. It tended in some degree to corroborate the testimony of the witness as to the res gestæ. The length of time that elapsed before the search was made would perhaps be a serious objection if it were not for the explanation, given by the witness himself, that he found the pieces of crock covered by leaf mould and overgrown with wire roots, thus indicating that they had probably been thrown there at the time of the murder. The secluded place in which they were found also tended to negative the idea that they were placed there by any other agency than that testified to by Mary Hartley. We agree with the learned judge in saying that the evidence was very slight, but still, in connection with other facts and circumstances, it was not improper for the consideration of the jury.

The admissions of the prisoner as testified to by J. W. Swartz were clearly competent evidence. In that interview he stated, among other things, that he had been invited to go along and help to kill the Kintzlers; that, in reply to Uriah Moyer's invitation to go along, he said, " No, that I can't do, but if you will do it I will walk away and not say anything about it." This, in connection with his enjoining upon the witness not to say anything about it, was a significant fact. It tended to prove that he was accessory before the fact to the murder; that while, according to his own statement, he declined to take an active part in the contemplated murder, he encouraged its commission by proposing to walk away and say nothing about it. In the light of other testimony tending to prove motive as well as actual participation in the murder, it was for the jury to say whether the extraordinary conduct and declarations of the prisoner did not point to him as one of the guilty parties.

There is no merit in the third assignment. It was not insisted on during the argument, and requires no further notice.

In connection with the other evidence in the case, the testimony referred to in the next assignment had some tendency to prove motive, and therefore it was not improperly admitted.

The remaining assignments relate to the admission of testimony offered for the purpose of showing motive, and, in connection with other evidence in the case, of proving the complicity of the prisoner. We fail to discern any error in either of them. The testimony complained of tended to prove facts and circumstances which were proper for the consideration of the jury. The offer covered by the eighth assignment was to prove that the prisoner, in conversation with the witness, de-

[Moyer *v.* Commonwealth.]

clared the fire at Kintzler's was not the result of an accident, and that he helped to burn them. It requires no argument to prove that the testimony was rightly received, as some evidence of guilty participation in the crime laid in the indictment. It might be regarded as slight, but, nevertheless, it was proper for the consideration of the jury.

The ninth assignment relates to the offer to prove that the prisoner knew that John Kintzler had a considerable sum of money about his house, and where he kept it. The possession of such knowledge by the prisoner may have been but slight evidence of motive, but in connection with other testimony before the jury, it was proper for their consideration. The fact that the money belonged to the husband alone, is of no practical consequence. If the controlling motive was to obtain possession of the husband's money, and in so doing, both husband and wife were murdered, it cannot be doubted that, on the trial for the murder of either, the motive which led to the commission of the double crime may be shown.

We have considered each assignment in connection with the testimony that was submitted to the jury, and find nothing in the record that calls for a reversal of judgment.

> The judgment is affirmed, and it is ordered that the record be remitted to the Court of Oyer and Terminer of Snyder County, for the purpose of execution.

### MOYER *v.* COMMONWEALTH.

The inability of the prisoner to furnish us, according to the rule, with the testimony necessary to a proper understanding of the only assignment of error in this case, rendered it necessary to carefully examine the testimony returned with the record and referred to in the charge of the court; and the result of that examination has been to satisfy us not only that the testimony complained of was rightly received, but also that the prisoner, after a full and fair trial, was justly convicted and sentenced. If the testimony, received and submitted to the jury in a clear and comprehensive charge, was believed by them, as we must now presume it was, they were clearly justified in rendering the verdict upon which judgment was afterwards pronounced. The only question presented for our consideration is whether the testimony of Mr. Gift was properly admitted for the purpose of corroborating Mary Hartley, the principal witness for the Commonwealth. She had testified to the prisoner's participation in the homicide, and the circumstances connected therewith. Among other things, she stated that immediately after the murder was committed and the money divided, one of the parties concerned therein scraped some of the blood from the floor

into a piece of red earthen crock, emptied it at the east end of the house, so that the people would think the Kintzlers were killed outside and would not look for their remains in the house, and then threw the crock over the top of an appletree into the adjoining woods.    It was proved by several witnesses that blood was found next morning where Mary Hartley said it had been emptied, and, in further corroboration of her testimony, the witness, Mr. Gift, was permitted to testify, under exception, that in August, 1880, he, in company with other persons, made search in the edge of the woods, where Mary Hartley said the piece of crock was thrown, and there, among the leaves and stones, found several pieces; in the language of the witness, "quite a number among the rotten leaves and dirt.    There were small roots grown over parts of the pieces, wire roots."    He also testified that he tried some of the pieces, and they fitted together, thus indicating that they were parts of a larger piece, corresponding in kind with that alleged to have been thrown away on the night of the murder.    This may appear to be a trifling circumstance, but in view of the fact that throughout the trial, the credibility of Mary Hartley was assailed as unworthy of belief, on the ground that, according to her own showing, she was an accomplice, it was not improper to corroborate her statement as to the res gestæ.    She had been corroborated as to other circumstances, but it was urged, as a special objection to the admission of the testimony complained of, that so long a time had elapsed before the pieces of crock were found.    In reply to this, the learned judge properly remarked that he could not say, "as matter of law, that it was too remote to be received in evidence."    The fact that the place where the pieces of crock were found was secluded, lessened the probability of their having been placed there by any other agency than that testified to by Mary Hartley; and the further fact that they were covered with leaf mould, and wire roots had grown over them, indicated that they had probably lain there from the time the murder was committed.    In connection with other facts and circumstances in the case, we cannot say it was improper to receive and submit the testimony to the jury.    As corroborative evidence, it may have been very slight, but still it was not incompetent.    We have examined the record with that degree of care which the gravity of the case demands, and are constrained to say there is no error that would warrant a reversal of the judgment.

The judgment is affirmed, and it is ordered that the record be remitted to the Court of Oyer and Terminer of Snyder County, for the purpose of execution.