## HOBACK v. UNITED STATES.

(Circuit Court of Appeals, Fourth Circuit. February 16, 1924.)

### No. 2193.

1. **Embezzlement ☞44(1)—Evidence held sufficient to sustain conviction.**

    In prosecution against officer in internal revenue service for embezzlement of morphine coming into his possession as such officer, evidence *held* sufficient to sustain a conviction.

2. **Criminal law ☞510, 780(1)—Accomplice need not be corroborated.**

    In the federal courts there is no hard and fast rule requiring the corroboration of an accomplice, although they recognize that it is well for the judge to call the attention of the jury to the frequently untrustworthy character of such evidence.

3. **Criminal law ☞510½—Testimony held properly admitted in connection with testimony of accomplice.**

    In a prosecution of an internal revenue officer for embezzlement of morphine, where W. testified that he sold morphine furnished by defendant, there was no error in allowing a purchaser from W. to testify to his purchase of drugs, and as to what took place on the night that W. was arrested with morphine in his possession, as against the contention that all testimony should be excluded which merely shows or tends to show

that the accomplice has told the truth about something which does not of itself, or apart from his story, prove or tend to prove that defendant had any part in the crime.

In Error to the District Court of the United States for the Western District of Virginia, at Roanoke; Henry Clay McDowell, Judge.

F. S. Hoback was convicted of having embezzled morphine, and brings error. Affirmed.

A. B. Hunt, of Roanoke, Va. (T. M. Darnall and N. H. Hairston, both of Roanoke, Va., on the brief), for plaintiff in error.

William A. Stuart, Sp. Asst. U. S. Atty., of Abingdon, Va., and C. E. Gentry, Asst. U. S. Atty., of Charlottesville, Va.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. The plaintiff in error was the defendant below and will be so styled here. He had been an officer in the internal revenue service of the United States and was in charge of the narcotic work in Virginia and some other states. He was indicted and convicted of having embezzled morphine, which had come into his possession as such officer and was under his control in that capacity. One Wright was the principal witness against him. The record apparently does not disclose what Wright's ostensible occupation was, but he admitted that he had been engaged in the illegal sale of whisky. In spite of the fact that he did not seem to have any lawful calling, or perhaps because of it, he appears to have had appreciable sums of money at his control. He and the defendant had known each other for two years or more. During a part of that time at least, they appear to have been intimate. Defendant admits he went on a hunting trip with Wright, when on the Mexican border, he sent Wright a postal card, such as one seldom takes the trouble to send to those he does not know well, and more significantly still, on at least two occasions, he borrowed sums of $100 each from Wright. He swears that during all of this time he knew or suspected that Wright was a professional breaker of the very law which it was his duty to enforce. He explains that he kept in close touch with Wright, because he hoped to obtain from him information as to violations of the law; but the jury may well have concluded that none was ever furnished.

Wright testified in great detail. He admitted that he had sold whisky in defiance of the law and that defendant knew it. The latter suggested to him that a good business could be done in selling dope, which the defendant could procure from the narcotics seized by the government agents. The witness said the defendant told him that one Penick was a dope peddler and would doubtless prove a good customer. The defendant proposed they should divide the proceeds of such sales as were made on a fifty-fifty basis. Wright assented, and from time to time received from the defendant comparatively small quantities of narcotics which were sold to Penick; the witness turning over half of the money paid to the defendant. On January 24, 1921, the defendant gave him a package of drugs said to be worth $720. Penick was, however, at the time not ready to buy. A few days later, after Penick was arrested on another charge, the defendant got the

package back, explaining that he feared that Wright might also be taken into custody. On the 7th of February, the witness told the defendant that he had arranged for the sale of six ounces to Penick. After agreeing with Penick as to where and how the delivery was to be made, he called up the defendant at the latter's home. The defendant said it would not be a good idea for them to be seen together, but fixed a time and place that evening at which they could safely meet. The witness gave an account of what he and Penick then did. In the end, they took a car driven by one Hurd and went within two or three blocks of defendant's residence, where the witness got out and, leaving his two companions in the car, went one block away to the appointed trysting place, and found the defendant waiting for him in the shadow of a tree. Defendant gave Wright a package, and told him to get $600 for it or to bring it back, adding that Wright could go to Richmond and get any price for it. He said, "I will take you there and protect you." The witness answered, "I will bring back the package, or the money, or be caught." Wright returned to the car. Penick wanted to examine the package. They drove to a garage. Penick took the package, and, after looking at it, handed it back to Wright. The party got into the car, drove some further distance, and at Penick's request, stopped at a sidewalk. Penick got out of the car, and just then some state officers, whom Penick had tipped off some hours earlier, appeared, arrested Wright, and seized the package of morphine. In an hour or two, the witness was released on bail, and he drove at once to defendant's house and the latter at Wright's request went with him to the police station and told the officer in charge that Wright had been carrying out defendant's instructions.

After leaving the police station, defendant concocted a false story to account for Wright's possession of the drugs, and told Wright to tell it and get the driver of the car to do the like. The arrest had, as already stated, been made by state officers; but, when the United States attorney heard of it, he thought the government should take charge of the prosecution. He testified that, when he told defendant so, the latter said that Wright was assisting him in uncovering dope violations, that he did not think Wright was guilty, or could be convicted, and that he did not think a warrant for him should be issued; but, upon the insistence of the United States attorney, defendant swore out one. After Wright and Penick had given bail before the United States commissioner, the defendant again repeated what he had previously said, and added that he (the defendant) would take the stand on Wright's behalf. It was shown that narcotics seized in the territory over which defendant had charge were collected at Richmond, and once every three months were shipped to Washington; that the regulations required each shipment to be accompanied by a list or inventory, showing with particularity where, when and from whom each portion of it had been seized. A shipment was made on January 21, 1921. The defendant took part in making it up, but, as neither the prescribed inventory nor any substitute for it was furnished, it was impossible to check it up. Under such circumstances, no one would have been the wiser, had the defendant at any time before the shipment abstracted some of the drugs. On the day preceding the shipment, defendant had, as he ad-

mitted, obtained a loan of $100 from Wright. On January 23 defendant returned from Richmond to his home in Roanoke, and according to Wright on the next day turned a package of drugs over to him. In the package which was found in Wright's possession on February 7 were several different kinds of containers, one of them at least being rather out of the common. In the shipment made to Washington on the 21st of January there were specimens of every one of these containers, not excluding the relatively rare one.

[1] By other testimony than that of Wright, it was abundantly shown that defendant had made contradictory and untrue statements with reference to various phases of the matter. We are satisfied that there was sufficient evidence to justify the jury in finding that the morphine in question had been wrongfully taken by the defendant from the drugs of which he had official custody.

[2, 3] Nor are we prepared to say that there was error in allowing Penick to testify to his purchase of drugs from Wright and as to what took place on the night of Wright's arrest. The defendant's learned and zealous counsel are able, it is true, to cite many cases to show that the corroboration of an accomplice required by the written or unwritten laws of many states is not forthcoming, unless the testimony which is relied on for that purpose goes to the extent of identifying the accused with the offense charged against him. In many, if not most, of them, however, evidence which falls short of that measure of proof was, in the very cases cited by the defendant, held admissible, although, when standing alone, insufficient to justify the conviction. In the federal courts, there is no hard and fast rule requiring the corroboration of an accomplice, although they recognize that it is well for the judge to call the attention of the jury to the frequently untrustworthy character of such evidence, and for him to suggest that they should scrutinize it with caution and should not accept it, unless it so far harmonizes with the other testimony in the case as to leave in their minds no reasonable doubt of its truth. All this the learned judge below did.

Defendant admits that in the federal courts a conviction may be had on the uncorroborated testimony of an accomplice, but nevertheless argues that even in them it is reversible error to admit evidence which, tested by the rules of logic, has no tendency to confirm, although to a jury it may have the seeming of doing so. They insist that all testimony should be excluded which merely shows or tends to show that the accomplice has told the truth about something which does not, of itself and apart from his story, prove or tend to prove that defendant had any part in the crime. They are supported by the great authority of Judge (afterwards Mr. Justice) Gray, in Commonwealth v. Holmes, 127 Mass. 424, 34 Am. Rep. 391, who with his usual learning and force stated and applied the rule for which defendant now contends; yet his conclusion has not passed unchallenged. In many well-considered cases in other states, the opposite view has been taken and sustained by what, with all deference to his well-established reputation, we are persuaded is the greater weight of reason. As, for example, among many others, see Carroll v. Commonwealth, 84 Pa. 107, 125 (the Molly McGuire Case), and State v. Carey, 76 Conn. 342, 56 Atl. 632.

Often, as would have been true in the instant case, the exclusion of all such evidence would make it hard for the jury to understand just what had taken place, and would inevitably make them feel that something had been withheld from them, which they should know. Because, in telling the whole story of the transaction under inquiry, something may be admitted to which the jury may conceivably give greater weight than in reason they should, is not to our way of thinking a conclusive reason for excluding it. We leave to the judgment of 12 men our lives, our liberty, and our property. It would seem that we should assume that the 12, or at all events some of them, have a modicum of common sense. They may, and often, have their prejudices. Sometimes from lack of legal training they may not have a clear idea of the particular thing upon which they are to pass. Under such circumstances, the trial court must exercise such power as it has to shut out evidence that may inflame their prejudices or confuse them as to the issue they are to try. To prevent waste of time, the inquiry, whatever it is, must be kept from straying too far afield. Much must be left to the sound judicial discretion of the trial judge, subject, of course, to review, but not lightly to be overruled. Certain other lines of testimony are excluded by more or less arbitrary rules, so firmly established that they may not be changed, otherwise than by legislation. We are not willing to add to their number. There is small reason for doing so in the federal courts, where the judge may assist the jury by pointing out to them what evidence before them is pertinent to each particular issue upon which they are to pass and what is not.

We see no reason to disturb the judgment below, and it is accordingly affirmed.