## UNITED STATES v. HEINE.
### No. 17.

Circuit Court of Appeals, Second Circuit.
Nov. 8, 1945.

George Gordon Battle, of New York City, for appellant.

Vine H. Smith, of Brooklyn, N. Y., for the appellee.

L. HAND, Circuit Judge.

Heine was indicted with thirty-two other defendants, under an indictment in two counts. The first count (under § 88 of Title 18, U.S.C.A.), was for a conspiracy to violate § 233 of Title 22, U.S.C.A.: which makes it a crime not to register with the Secretary of State, if one is acting as an agent for a foreign government. The second count under § 34 of Title 50, U.S.C.A., was for a conspiracy to violate § 32 of that title, the relevant language of which is set forth in the margin.* The most important point raised upon this appeal, and the only one which we find it necessary to discuss, is the sufficiency of the evidence to sustain a verdict. We will consider the two counts in inverse order, for the second is much the more important; especially as the defendant has already served the term for which he was sentenced under the first.

Heine was a native-born German, fifty years old at the time of the trial (November and December, 1941), who came to this country in June, 1914. Although he had had some business experience, his first job in the United States was as a mechanic in the Packard Motorcar Company in Detroit, where he lived with his brother. In January, 1918, he went into the employ of the Ford Motor Company, and was sent to the West Indies in 1919. Upon his return in 1920, the company sent him to South America, where he worked in Brazil, Argentine, Uruguay and other countries. He was naturalized in 1920, was married in January, 1922; and in August, 1922, returned to this country. Later he went to England, and after that to Italy, the Balkans, and Barcelona. He came back again to this country in 1925; but on January 1, 1926, he was sent to Berlin as assistant manager of the Ford assembly plant, and in August, 1928, he became a manager of the business. Late in 1930 or early in 1931, he went to Cologne to superintend a new manufacturing plant which had been built there. In 1935 he returned to Detroit, and in May of that year he left the Ford Company for good, and took a position with the Chrysler Corporation, for which he worked in Spain, Portugal and North Africa.

In 1938 and 1939 a German automobile corporation, known as the Volkswagenwerke, suggested that a position might be open to him; but this he was unwilling, however, to consider, because, as he swore, the American consul at Munich told him that he must go home, if he wished to keep his citizenship. Whatever the reason, he did return to the United States in May, 1940, with authority from the Volkswagenwerke to recover some deposits paid to local companies which they had received upon contracts that the companies had abandoned. The Volkswagenwerke also asked him to find out what he could about the automobile and aviation industries in this country. A few weeks after his return he began to send back reports about the aviation industry which constitute the

* "§ 32. Unlawfully disclosing information affecting national defense. Whoever, with intent or reason to believe that it is to be used to the injury of the United States or to the advantage of a foreign nation, communicates, delivers, or transmits, or attempts to, or aids or induces another to, communicate, deliver, or transmit, to any foreign government, or to any faction or party or military or naval force within a foreign country, whether recognized or unrecognized by the United States, or to any representative, officer, agent, employee, subject, or citizen thereof, either directly or indirectly, any document, writing, code book, signal book, sketch, photograph, photographic negative, blue print, plan, map, model, note, instrument, appliance, or information relating to the national defense, shall be punished by imprisonment for not more than twenty years."

gravamen of the charge against him. These he continued to send until August, 1940, and perhaps later, though not after December 7, 1941. At the direction of the Volkswagenwerke he did not send these direct, but posted them to addresses in New York and Lima, Peru, from which they were to be forwarded to Germany. The evidence permitted the jury to find that this course was surreptitiously adopted in order to escape detection.

The information which Heine collected was from various sources: ordinary magazines, books and newspapers; technical catalogues, handbooks and journals; correspondence with airplane manufacturers; consultation with one, Aldrich, who was already familiar with the industry; talks with one or two employees in airplane factories; exhibits, and talks with attendants, at the World's Fair in New York in the summer of 1940. This material he condensed and arranged in his reports, so as to disclose in compressed form the kinds and numbers of the planes—military and commercial—which were being produced and which it was proposed to produce; the location and capacity of the factories; the number of their employees; and everything else, of which he could get hold, that would contribute to as full a conspectus as possible of the airplane industry. All of this information came from sources that were lawfully accessible to anyone who was willing to take the pains to find, sift and collate it; no public authorities, naval, military or other, had ordered, or indeed suggested, that the manufacturers of airplanes—even including those made for the services—should withhold any facts which they were personally willing to give out. The question which the second count raises is whether § 32 of Title 50, U.S.C.A. covers such activities as we have described.

■ The evidence as a whole supported a finding that Heine was engaged in collecting all available information about our production of airplanes, so that the Reich should be advised of our defense in the event of war. That would not however serve, unless § 32 would have equally condemned what he did, if he had sent his reports to a friendly power in a time of unthreatened peace. This follows from the fact that the section covers, not only information intended to be used "to the injury of the United States," but that intended to be used "to the advantage of a foreign nation." When the bill left the House it did not have the second clause; and it does not appear at what stage it was amended by adding the alternative, which greatly enlarged its scope; for while it is true that it is somewhat hard to imagine instances in which anyone would be likely to transmit information "relating to the national defense," which would be injurious to the United States, and yet not advantageous to a foreign power, it is possible to think of many cases where information might be advantageous to another power, and yet not injurious to the United States. The section as enacted necessarily implies that there are some kinds of information "relating to the national defense" which must not be given to a friendly power, not even to an ally, no matter how innocent, or even commendable, the purpose of the sender may be. Obviously, so drastic a repression of the free exchange of information it is wise carefully to scrutinize, lest extravagant and absurd consequences result.

It seems plain that the section cannot cover information about all those activities which become tributary to "the national defense" in time of war; for in modern war there are none which do not. The amount of iron smelted, of steel forged, of parts fabricated; the number of arable acres, their average yield; engineering schools, scientific schools, medical schools, their staffs, their students, their curriculums, their laboratories; metal deposits; technical publications of all kinds; such nontechnical publications as disclose the pacific or belligerent temper of the people, or their discontent with the government: every part in short of the national economy and everything tending to disclose the national mind are important in time of war, and will then "relate to the national defense." If the words mean that, it would be criminal to send to a subject of Britain or to a citizen of France a railway map, a list of merchant ships, a description of automobile assembly technique, an account of the latest discoveries in antisepsis, or in plant or animal breeding, or even a work upon modern physics, provided only the sender had reason to believe that the information might reach the government, and be helpful to it in any of its activities. Nor would this become tolerable, though we limited the phrase to what would be advantageous to those countries in their own national defense, because that is as all-embracing as

our own. Such an assertion of national isolationism is certainly not to be imputed to Congress.

█ A less impossible interpretation would be to confine the clause to information about things adapted only for the national defense, and things of ambiguous use which have been already collected, or prepared, for the supply of the armed services. The first would include airplanes, cannon, small arms and munitions of war, warships, forts, and the like: the second, coal, food, clothing or other supplies accumulated for the army and navy. In that interpretation the clause would cover those military planes, though made by private companies, which Heine's reports included. Even so, there might be doubt whether the judge's charge to the jury should not have distinguished between military and commercial planes; but we need not consider that question because we think that it was lawful for him to include information about both kinds of planes. As declared in Gorin v. United States, 312 U.S. 19, 28, 61 S.Ct. 429, 85 L.Ed. 488, and, as the judge himself charged, it is obviously lawful to transmit any information about weapons and munitions of war which the services had themselves made public; and if that be true, we can see no warrant for making a distinction between such information, and information which the services have never thought it necessary to withhold at all. There can, for example, be no rational difference between information about a factory which is turning out bombers, and to which the army allows access to all comers, and information about the same bombers, contained in an official report, or procured by a magazine through interviews with officers. The services must be trusted to determine what information may be broadcast without prejudice to the "national defense," and their consent to its dissemination is as much evidenced by what they do not seek to suppress, as by what they utter. Certainly it cannot be unlawful to spread such information within the United States; and, if so, it would be to the last degree fatuous to forbid its transmission to the citizens of a friendly foreign power. "Information relating to the national defense," whatever else it means, cannot therefore include that kind of information, and so far as Heine's reports contained it, they were not within the section.

█ There is independently reason to suppose that this was the meaning which the House at least had in mind when the bill was before it during the First War— 1917. It is true that the debates on the floor of both Houses do not tell much, but at the hearings before the Judiciary Committee a number of the witnesses expressed concern at the possible suppression of information as the bill read even before its scope had been enlarged by the amendment. Possibly it was to allay these fears that the Committee, in reporting to the House, used the following words in connection with § 4 as it then was: "This section of the bill has been carefully and patiently considered by the Committee. The Committee realizes that the section as recommended gives the President broad power, but it must be admitted by all patriotic persons anxious for the success of our armies in times like these through which we are now going, it is important that the Commander-in-Chief shall have authority to prevent the publication of national defense secrets which would be useful to the enemy, and, therefore, harmful to the United States." Section 4, about which this language was used, gave the President power to declare a national emergency, and to "prohibit the publication or communication of * * * any information relating to the national defense which in his judgment is of such a character that it is, or might be, useful to the enemy." It is most unlikely that the words in § 4 had a meaning different from the same words then in § 2 of the bill, and now in § 32 of Title 50. At least the Judiciary Committee of the House supposed that the act was directed at "secrets." It is not necessary for us to go so far; and in any event "secrets" is an equivocal word whose definition might prove treacherous. It is enough in the case at bar to hold, as we do, that whatever it was lawful to broadcast throughout the country it was lawful to send abroad; and that it was lawful to prepare and publish domestically all that Heine put in his reports. We do not forget that there was evidence that in his letters and in his talks he misled his correspondents as to his motive in asking for information; but that is not relevant to the second count. Whatever the wrong done to his correspondents, that motive did not make the spread of information criminal, which it would not have been criminal to spread, if he had got it fairly. Nor did it make a difference that Heine did not transmit to the Volkswagenwerke the information as he got it;

but combed it out, arranged it and compressed it into convenient form. The section is aimed at the substance of the proscribed information, not at the act of making it more readily available for use.

Gorin v. United States, supra (312 U.S. 19, 61 S.Ct. 429, 85 L.Ed. 488), contains nothing to the contrary of what we are holding. It is true that the court (312 U.S. 28, 61 S.Ct. 434) there accepted the following definition of the phrase, "relating to the national defense" taken from the prosecution's brief: "a generic concept of broad connotations, referring to the military and naval establishments and the related activities of national preparedness." The words, "related activities of national preparedness," do indeed create a penumbra of some uncertainty; but it cannot comprise such information as is here in question, as appears from what immediately preceded the language we have quoted: "Where there is no occasion for secrecy, as with reports relating to national defense, published by authority of Congress or the military departments, there can, of course, in all likelihood be no reasonable intent to give an advantage to a foreign government." Obviously, this could not mean that it may not be to the advantage of a foreign government to have possession of such information; it can only mean that, when the information has once been made public, and has thus become available in one way or another to any foreign government, the "advantage" intended by the section cannot reside in facilitating its use by condensing and arranging it.

As to the first count, in spite of the absence of any direct evidence showing the connection of the Volkswagenwerke with the Reich, there was ample in Heine's history and conduct to support a verdict based upon the finding that he was acting as an agent for the Reich, and the jury was of course not bound to accept his own explanation. The Volkswagenwerke had never made airplanes; and, so far as appears, they did not propose to make military planes anyway. Why should they wish accounts of the industry in this country as complete as possible? What good would it do them to learn the amount of our production, all of which at the time was for our own use? Moreover, although it is true that in the summer of 1940, war was not imminent, everyone knew that it was not impossible. France had fallen; Russia was apparently neutral, and had overrun part of Poland in conjunction with Germany; Britain stood alone, with every prospect of herself going down. We were already embarked upon our belated preparation, and that could be directed only against the Reich. If a jury was not permitted in such a setting to infer that the collection and transmission of such information by such means as Heine employed, was for the Reich, and not for the Volkswagenwerke, there is an end to circumstantial proof. Nobody but a simpleton could fail to detect the hall-marks of the principal in whose interest the whole web of chicane and evasion had been woven.

Conviction on the first count affirmed.

Conviction on the second count reversed.