**UNITED STATES of America,**
**Appellee,**

v.

**Rudolph Ivanovich ABEL, also known as "Mark" and also known as Martin Collins and Emil R. Goldfus, Appellant.**

**No. 331, Docket 24968.**

United States Court of Appeals
Second Circuit.

Argued April 16, 1958.

Decided July 11, 1958.

Certiorari Granted Oct. 13, 1958.
See 79 S.Ct. 59.

James B. Donovan, Brooklyn, N. Y.
(Arnold G. Fraiman, New York City,

Thomas M. Debevoise, II, Woodstock, Vt., of counsel), for appellant.

William F. Tompkins, Asst. Atty. Gen., Cornelius W. Wickersham, Jr., U. S. Atty., E.D.N.Y., Brooklyn, N. Y., Harold D. Koffsky, Kevin T. Maroney, Bruce J. Terris, Philip R. Monahan, James J. Featherstone, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before CLARK, Chief Judge, and LUMBARD and WATERMAN, Circuit Judges.

WATERMAN, Circuit Judge.

On August 7, 1957 a grand jury in the Eastern District of New York returned an indictment charging the appellant, Rudolph Ivanovich Abel, with having conspired to violate the espionage laws of the United States. Specifically, the indictment charged Abel with having conspired (1) to violate 18 U.S.C. § 794 (a) by communicating information concerning the national defense of the United States to the Union of Soviet Socialist Republics; (2) to receive and obtain material connected with the national defense of the United States for the purpose of transmitting such material to the Soviet government in violation of 18 U.S.C. § 793(c); and (3) to violate 18 U.S.C. § 951 by acting in the United States as an agent of a foreign government without prior notification thereof having been given to the Secretary of State. Prior to his trial upon this indictment, Abel moved pursuant to Rule 41(e) of the Federal Rules of Criminal Procedure, 18 U.S.C. for the return and suppression of certain evidence obtained by the Government as a result of an alleged unlawful search and seizure. The motion was heard by Judge Byers who, after a hearing, denied it in an opinion reported at 155 F.Supp. 8. The appellant was tried to a jury and convicted on each of the counts in the indictment. On November 15, 1957 he was sentenced to a total of thirty years imprisonment.

The primary issue raised by this appeal is whether the Fourth Amendment prohibition of "unreasonable searches and seizures" was violated when government agents without a search warrant searched a hotel room occupied by Abel and seized certain articles which they found there. Also, we are called upon to determine whether there was sufficient evidence in the record to sustain a finding that Abel conspired to communicate to the Soviet Government information the transmission of which is prohibited by the espionage laws, see United States v. Rosenberg, 2 Cir., 1952, 195 F.2d 583, certiorari denied 344 U.S. 838, 73 S.Ct. 20, 97 L.Ed. 687; United States v. Heine, 2 Cir., 1945, 151 F.2d 813, certiorari denied 328 U.S. 833, 66 S.Ct. 975, 90 L.Ed. 1608, and to determine whether the trial judge erred by receiving in evidence the testimony of a non-commissioned Army officer that he cooperated with the Soviet Government while serving in the American embassy in Moscow. And lastly, counsel for the appellant urge that a new trial is required because the cumulative effect of a variety of minor errors alleged to have occurred during the trial was such that the appellant did not have a fair trial.

In early May 1957 one Reino Hayhanen entered the American embassy in Paris and informed the officials there that he was an espionage agent in the United States for the Soviet government. Hayhanen was interrogated by the officials and later was flown back to the United States where he was questioned by agents of the Federal Bureau of Investigation. It was largely from the testimony of Hayhanen, though there was evidence from other sources as well, that the jury learned of the appellant's activities in the United States. Although there is no dispute about the sufficiency of the evidence to prove concerted activity between Abel and others on behalf of the Soviet government, a brief résumé of the record developed at the trial will be useful to indicate the scope of the conspiracy which was proved and the means by which its purposes were to be accomplished.

Abel is a native of Russia, a citizen of the U. S. S. R., and a Colonel in the K. G. B., an espionage agency of the Soviet

government. By his own admission he entered this country illegally in 1948 at an unknown point along the Canadian border. After this illegal entry the appellant, whose cryptonym is "Mark," adopted several aliases, one of which was Emil Robert Goldfus, the name of an infant who had died in New York City in 1903; while another was Martin Collins, a fictitious individual purportedly born in New York City. At the time of his arrest, on June 21, 1957, Abel was residing at the Hotel Latham in Manhattan and had rented an artist's studio in Brooklyn.

Hayhanen was also an agent of the K. G. B. and at the time of Abel's arrest held the rank of Lieutenant Colonel, though at the time he entered this country several years earlier he had been a Major. Hayhanen entered this country in 1952 with the passport and identity of one Eugene N. Maki, a native of the United States who had left this country for Russia in 1927.[1] Upon his arrival in New York City Hayhanen, according to his instructions, placed a tack in a designated sign in Central Park. This prearranged signal was the means by which he was to notify Soviet agents in New York that he had arrived safely and was not under surveillance.

Prior to the time that he had left the U. S. S. R. Hayhanen had received extensive training in the techniques of espionage. Thus, he was given instruction in photography with emphasis on making "microdots"[2] and "soft film."[3] He was also taught how to secrete messages in hollowed out objects such as coins, bolts, screws and match books. In addition, he was given training in cryptography and assigned the cryptonym "Vik" which he was to use when communicating with other espionage agents. Hayhanen was also advised of the location of three "drops" in New York City. A "drop" is a hiding place used for the transmission of messages concealed in containers. Hayhanen was instructed to use these "drops," which were located in a wall on Jerome Avenue in the Bronx, a bridge in Central Park, and a lamp post in Fort Tryon Park,[4] in communicating with his superiors.

Hayhanen had been sent to this country to serve as an assistant to an individual whom he then knew only as "Mark." Nevertheless, he did not meet Abel until the summer of 1954 when the two of them met in the men's smoking room at a theatre in Flushing. As far as appears, the only significance of this meeting was that Abel expressed some concern that Hayhanen obtain "cover work" which would not interfere with his espionage duties.[5] Thereafter, Hayhanen saw Abel frequently, received his salary from him, and carried out several missions at his direction. On

1. Hayhanen's testimony revealed the elaborate detail with which this illegal entry into the country had been planned. In 1949 he was smuggled into Finland by Soviet officials and remained there until 1952 when he embarked for the United States. During this time he assumed the identity of Maki and received funds with which to pay individuals in Finland so that they would be willing to state that he had lived in that country since 1943.

2. "Microdot" is the term ordinarily used for a photographic reduction of a document which is capable of being enlarged so as to be readable. Hayhanen also received instructions on this subject from Abel after he had met the latter in this country.

3. "Soft film" is made from ordinary film by chemically treating the latter so as to remove its backing. The significance of "soft film" for espionage purposes is that it is pliable and capable of being folded to a small size.

4. The location of the "drops" was changed from time to time, but each was regularly assigned a number. Whenever Hayhanen had a communication for his superiors which he had concealed in a "drop," he would make a horizontal line in colored chalk on a slat in a designated fence in Central Park, the number of the slat, counting from the street side, corresponding to the number of the "drop" at which the message had been left.

5. "Cover work," as Hayhanen testified, is a means of visible support, necessary to avoid arousing suspicion concerning the activities of an agent.

several occasions he saw Abel make use of "drops" which had been assigned to him and once was told by the appellant that the latter had several agents under him. Abel admitted to Hayhanen that he had received coded messages and on one occasion Hayhanen observed Abel attempting to receive the signals of a short-wave radio station. This attempt was unsuccessful. Also unsuccessful were attempts by Abel to find a suitable location for the establishment of a radio station which he had received instructions from Moscow to establish.

The record contains no indication that Abel or any of his colleagues were ever successful in transmitting to the Soviet Government any information pertaining to the national defense, but as the legality of a conspiracy is not to be judged by its success, the failure to show success is of no relevance. United States v. Rabinowich, 1915, 238 U.S. 78, 35 S.Ct. 682, 59 L.Ed. 1211; United States v. Morello, 2 Cir., 1957, 250 F.2d 631. Considerable evidence is contained in the record establishing a continuous activity by the appellant on behalf of the Soviet government. This evidence need not be considered in detail; it will be sufficient to describe a particular episode which is relevant to issues raised by Abel on this appeal.

Sometime between July and December 1954 Abel received instructions from Moscow to locate a Soviet agent named Roy Rhodes, whose cryptonym was "Quebec." The instructions stated that Rhodes' wife owned several garages in Red Bank, New Jersey, but when, in late 1954, Abel and Hayhanen went to Red Bank they were unable to locate Rhodes. Abel instructed Hayhanen that in the latter's next message to Moscow he should request additional information about Rhodes. Hayhanen received a reply stating that Rhodes' family lived in Colorado and by some means not apparent from the record he and Abel were able to determine that the family lived in the town of Salida. Abel instructed Hayhanen to take a trip to Salida. Prior to the time that Hayhanen left, he and Abel went to the Central Library in Manhattan and obtained the name and telephone number of Rhodes' father. Hayhanen called this number when he arrived in Salida, stated that his name was Mike and that he would like to contact Rhodes. The party on the other end of the line, subsequently identified as Arlene Brown, a sister of Rhodes, informed Hayhanen that Rhodes was living in Tucson, Arizona. Hayhanen returned to New York and reported to Abel. Though there was some discussion as to whether Hayhanen should go to Tucson, Abel finally decided against it.

A discussion of Rhodes' role in the Soviet espionage system may be deferred until that portion of the opinion which deals with the admissibility of his testimony at the trial below. It is sufficient at this point to note the reason why Abel and his colleagues were so anxious to locate Rhodes. In the words of the witness Hayhanen:

"He [Abel] said that Quebec could be a good agent because he is—some of his relatives are working on—and he—on military lands.

"He meant Quebec's brother, who was working somewhere—I cannot remember exactly, but in some atomic plant, or what it was."

In the summer of 1955 the appellant took a trip to the U. S. S. R. He and Hayhanen did not meet again until the following summer. At that meeting and during the next few months, arrangements were made for Hayhanen to travel to Russia on leave. Hayhanen left New York aboard the Liberté on April 24, 1957. Shortly after arriving in Paris, he notified other Soviet agents, by prearranged signal, that he had arrived safely and that he was proceeding to West Berlin. Instead of proceeding with this plan, he went to the American embassy where he informed the officials of his activities.

As a result of these disclosures agents of the F. B. I. began an intensive in-

vestigation of the appellant—an investigation which led to his arrest on June 21, 1957 by agents of the Immigration and Naturalization Service.

## I. *Search and Seizure*

The search and seizure issue raised by the appellant involves three separate and distinct questions: (1) whether agents of the Immigration and Naturalization Service, when making a valid arrest pursuant to a deportation arrest warrant,[6] may, as an incident of the arrest, conduct a search of the hotel room in which the arrest is made without possessing a search warrant; (2) whether it was "clearly erroneous" for the distinguished trial judge to have found that the search conducted by the I. N. S. agents in the present case was conducted in good faith solely for the purpose of discovering weapons and evidence of alienage; or whether, contrary to that finding, the agents' true purpose in searching Abel's hotel room was to discover evidence of his espionage activities; (3) whether, assuming that the search was conducted in good faith, the articles seized by the I. N. S. agents might lawfully be seized in the absence of a search warrant.

■ Proper understanding of the several facets of the search and seizure issue raised by the appellant necessitates that we state in some detail the circumstances surrounding his arrest and the search of his hotel room. For, as the Supreme Court has frequently observed, only "unreasonable searches and seizures" are prohibited by the Fourth Amendment, and the determination of whether a search or seizure is unreasonable depends upon the particular facts and circumstances of each case. See United States v. Rabinowitz, 1950, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653; Harris v. United States, 1947, 331 U. S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399.

■ Almost immediately after Hayhanen's disclosures in early May of 1957, agents of the F. B. I. placed Abel under surveillance. On several occasions he was observed at 252 Fulton Street in Brooklyn, the address of the studio which he had rented. Also, on a date which does not appear in the record, F. B. I. agents rented the room in the Hotel Latham immediately adjacent to that occupied by Abel under the name of Martin Collins. Meanwhile, Hayhanen, who had been flown from Paris to New York, continued his cooperation with United States officials and directed F. B. I. agents to various espionage materials which he accused Abel of having given to him.

On June 13 agents of the I. N. S. were for the first time informed that the F. B. I. had information concerning an alien illegally in this country. This information was conveyed by one Sam Papich, the F. B. I. liaison officer with the I. N. S., to Mario T. Noto, Deputy Assistant Commissioner for Special Investigations of the I. N. S. Noto was also informed that there was evidence that the suspect, Abel, had engaged in espionage. At Noto's request Papich stated that he would attempt to obtain additional information relating to Abel's illegal entry and his status in the United States. Noto testified at the hearing on the motion to suppress that he had not asked Papich for any information concerning Abel's espionage activities "because my interest from a jurisdictional viewpoint is confined to the illegal status which he had in the United States." Noto further testified that Papich had not requested I. N. S. to treat the case in any particular manner and that, aside from this request by him for further information, no arrangements for cooperation were made between the two agencies. Approxi-

---

6. 8 U.S.C.A. § 1252(a) provides that "Pending a determination of deportability in the case of any alien as provided in subsection (b) of this section, such alien may, upon warrant of the Attorney General, be arrested and taken into custody."

Pursuant to the authorization of delegation contained in 8 U.S.C.A. § 1103(a), regulations have been promulgated authorizing the issuance of warrants by district directors of the Service. 8 C.F.R. 242.2(a).

mately a week later Papich returned and gave Noto the additional information which the latter had requested, including the fact that the suspect's true name was Rudolph Abel, that he had entered the country by way of Canada, that in so doing he had used a birth certificate which was not his own, and that he had stated to several persons that he was in this country illegally. Noto was also informed that Abel was an officer in the Soviet espionage system. Prior to this time, Noto had conducted a search of I. N. S. records to determine whether I. N. S. had any information concerning the suspect.

After obtaining this additional information from Papich, and after acquainting General Swing, the Commissioner of the I. N. S., with the details of the case, Noto again met with F. B. I. agents. At one point during this meeting he informed the agents that he "would determine very shortly as to whether or not I would order that Mr. Abel be apprehended for immigration purposes * * *" Later, he informed the agents that he would "very quickly" order the arrest of Abel for "having failed to notify the Attorney General of his address in the United States as required by the Immigration and Nationality Act which makes it a deportable offense."[7] On June 20 Noto met with two other I. N. S. officers and informed them for the first time of the Abel case. These three men then went to the offices of the F. B. I. where the evidence against Abel was again reviewed. The I. N. S. officials agreed that the evidence was sufficient to justify issuance of a "show cause" order as to Abel's deportability and that an administrative arrest warrant should be drawn. The decision to use an administrative warant was, in effect, a decision that Abel should be held for a deportation hearing and not apprehended as one charged with a criminal offense; but at the hearing on the motion to suppress Noto testified that in his expert opinion the election to commence deportation proceedings would not preclude a subsequent criminal prosecution. Noto testified that he alone made the decision as to the type of proceeding which was to be initiated.

The "show cause" order and arrest warrant were drawn in Washington and Noto instructed two I. N. S. agents to take them to New York to be signed by John Murff, Acting District Director of the I. N. S. there, after which they were to supervise the arrest of Abel. The agents were also instructed to communicate with the F. B. I. office in New York. Noto testified that this latter instruction was given on his own initiative and that it had not been requested by agents of the F. B. I. The I. N. S. agents went to New York where they carried out the instructions which Noto gave them. After Murff had signed the "show cause" order and arrest warrant, the I. N. S. agents communicated with the agents of the F. B. I. who requested an opportunity to talk with Abel prior to his arrest. The purpose of this request, which was granted by the I. N. S. officials, was to determine whether Abel would agree to "cooperate." Agent Farley, one of the I. N. S. agents who made the arrest, testified that his instructions were to make it; and that, contrary to appellant's contention, he received no instructions that the arrest was to be contingent upon whether or not appellant agreed to cooperate with the F. B. I. agents.

At approximately 7:00 A.M. on June 21, while I. N. S. agents waited in an adjoining room, agents of the F. B. I. knocked on the door of Abel's hotel room and gained admittance to it. They showed Abel their credentials and informed him that they were charged with the duty of investigating matters pertaining to the internal security of the United States. Abel, whom the agents

7. The failure of an alien to notify the Attorney General of his address as required by 8 U.S.C.A. § 1305 is a criminal offense under 8 U.S.C.A. § 1306 and constitutes grounds for deportation under 8 U.S.C.A. § 1251.

addressed as "Colonel," was asked a number of questions, some of which he answered. He declined to reply to others. He was told that the agents had information that he had engaged in espionage and that his "cooperation" was solicited. He was also told that if he did not "cooperate," he would be arrested before he left the room. After nearly a half hour of questioning, the F. B. I. agents decided to have the I. N. S. agents arrest the appellant, and one of them left the room to so notify them. Thereupon, the I. N. S. agents entered the room and arrested Abel. They then searched the room for the purpose, according to their testimony, of finding either weapons or evidence of alienage. It is undisputed that the F. B. I. agents, though present when the search was made, did not participate in it. The only articles seized during this search were: (1) a birth certificate in the name of "Martin Collins"; (2) a birth certificate in the name of "Emil Goldfus"; (3) an international certificate of vaccination issued in the name of "Martin Collins"; and (4) a bank book issued by the East River Savings Bank in the name of "E. R. Goldfus."

While they were in Abel's room the I. N. S. agents also seized three slips of paper, only one of which was offered and admitted into evidence. These slips were seized under the following circumstances: The agents told Abel that he could pack and take with him anything that he desired. When he had finished packing he asked for and received permission to repack one of his bags. While he was repacking the bag, one of the I. N. S. agents noticed that he was trying to secrete some papers in his sleeve. These papers then were seized by the agent. The one that was introduced into evidence was a strip of graph paper containing a coded message in grouped digits.

Abel gave agent Farley a sufficient amount of money to pay the rent for his room until 3:00 P.M. of that day, and this money was paid to the hotel by another agent who promptly checked Abel

out. At approximately 8:30 A.M. the I. N. S. agents left the hotel with Abel and drove to the district office of the I. N. S. As soon as they had left, F. B. I. agents inquired of the hotel manager whether Abel had "checked out" and, upon receiving an affirmative answer, they requested and received from the hotel manager a written consent to search the room which Abel had occupied. When these agents searched the room they seized the entire contents of a wastebasket which partially consisted of articles which Abel had discarded while packing. Only two articles seized during this search were offered and admitted into evidence: a piece of wood wrapped in sandpaper and containing a cipher pad, and a hollowed-out wooden pencil containing microfilm.

On these facts Judge Byers, who heard the motion to suppress, rejected the appellant's contention that federal agents had violated the Fourth Amendment. He held that I. N. S. agents making an arrest pursuant to an administrative warrant may, as an incident of that arrest, conduct a search of the hotel room in which the arrest is made, and he found that the search of Abel's room was made in good faith for the purpose of discovering weapons and evidence of alienage and not for the purpose of uncovering evidence of Abel's espionage activities. For the reasons hereinafter stated we agree with this conclusion of law and decline to reverse this finding of fact.

A.  *Lawfulness of Search Incident to Arrest upon Deportation Charges.*

■ With the single exception of Trupiano v. United States, 1948, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, overruled in United States v. Rabinowitz, supra, the Supreme Court has consistently held that government agents may, as incident to a lawful arrest, conduct a search of the premises where the arrest is made. Harris v. United States, supra; Agnello v. United States, 1925, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145. Counsel for the appellant point out that in every case in which such a search

has been upheld the arrest was made for the commission of a crime. Relying upon Harisiades v. Shaughnessy, 1952, 342 U.S. 580, 72 S.Ct. 512, 96 L.Ed. 586, in which deportation proceedings were characterized as civil rather than as criminal proceedings, counsel urge that the issuance of the administrative arrest warrant and the apprehension of appellant pursuant to it did not confer upon the arresting officers the right to search the hotel room in which the arrest was made. Some support for this position may be found in Robinson v. Richardson, 1859, 13 Gray, Mass., 454 in which the Supreme Judicial Court of Massachusetts held a Massachusetts statute invalid as authorizing "unreasonable searches and seizures" because it provided for the issuance of warrants to search for the property and books of account of insolvent debtors. During the course of its opinion, later cited with approval in Boyd v. United States, 1886, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, the court pointed out that "Search warrants were never recognized by the common law as processes which might be availed of by individuals in the course of civil proceedings, or for the maintenance of any mere private right; but their use was confined to cases of public prosecutions, instituted and pursued for the suppression of crime or the detection and punishment of criminals." 13 Gray at page 456. Nevertheless, although the Massachusetts court mentioned the civil nature of the proceedings, later portions of its opinion indicate that the main objection it found to the use of a search warrant the statute authorized was that it "is to be used exclusively * * * as a

remedial process *in cases where nothing but a personal claim or the right to prosecute a private suit is involved."* 13 Gray at page 457 (emphasis supplied).

By contrast, deportation, like punishment for crime, as Judge Byers stated below, "is initiated in the interests of the United States and for the protection of its citizens. * * *" 155 F. Supp. at page 10. The similarity between criminal actions and deportations is attested to by the fact that the identical charges upon which Abel was arrested may be made the subject either of a criminal prosecution, 8 U.S.C.A. §§ 1306, 1325, or a deportation hearing, 8 U.S.C.A. §§ 1251(a) (1), 1251(a) (5). Moreover, the procedure applicable to deportation proceedings, though in some respects different than that applicable to criminal proceedings, see Carlson v. Landon, 1952, 342 U.S. 524, 537, 72 S.Ct. 525, 96 L.Ed. 547, is in many ways similar. Arrest and detention are provided for by statute, see 8 U.S.C.A. § 1252(a), and indeed have been recognized by the Supreme Court as a necessary part of the deportation procedure. Carlson v. Landon, supra, 342 U.S. at page 538, 72 S.Ct. at page 533.

With these similarities in mind, there would appear to be no basis for distinguishing between the right of government agents to conduct a search incident to a lawful arrest for commission of a crime and their right to conduct a search incident to a lawful arrest in connection with deportation proceedings. The grounds of public policy and convenience which justify the former are no less strong in the case of the latter.[8]

---

8. As far as we have been able to determine, the Third Circuit appears to be the only appellate court to have considered the power of I. N. S. agents to conduct a search as incident to a lawful arrest in connection with deportation proceedings. See Diogo v. Holland, 3 Cir., 1957, 243 F.2d 571; Da Cruz v. Holland, 3 Cir., 1957, 241 F.2d 118. Both of those cases were decided *per curiam*, and neither contained a discussion of the problem, but in each case the court apparently assumed that searches made by I. N. S. officers incident to lawful arrest are not unlawful *per se*. In Taylor v. Fine, D.C.S.D.Cal.1953, 115 F.Supp. 68, 70, Chief Judge Yankwich stated by way of dictum that "Incidental to a legal arrest whether with or without a warrant, the officers [I. N. S. agents] may conduct a reasonable incidental search," but each of the cases which he cited in support of this proposition involved a criminal prosecution.

■ Of course, as counsel for the appellant point out, the warrant upon which Abel was arrested was an administrative warrant and hence was not issued under the safeguards associated with judicially issued warrants of arrest. Nevertheless, the search by the I. N. S. agents was not rendered unlawful on that account. Searches conducted as incident to a lawful arrest have frequently been upheld by the courts even though the arrest was made without issuance of any process. See e.g., Agnello v. United States, supra, 269 U.S. at page 30, 46 S.Ct. at page 5; Marron v. United States, 275 U.S. 192, 198–199, 48 S.Ct. 74, 72 L.Ed. 231. And, in this Court at least, it has long been settled that a search conducted pursuant to an arrest made without a warrant is not dependent upon the urgency of the situation. In United States v. Lindenfeld, 2 Cir., 1944, 142 F.2d 829, we sustained the validity of a search without a warrant as incident to an arrest without a warrant where the lawfulness of the arrest was due to the fact that a felony had been committed (though not in the presence of the arresting officers) and the arresting officers had probable cause for believing that the person arrested had committed it. Cf. United States v. Jones, 7 Cir., 1953, 204 F.2d 745. In view of these decisions, we hold that the search by the I. N. S. agents was lawful even though the arrest was not authorized by a judicially issued warrant for the arrest of appellant.

B. *Lawfulness of Search—"Good Faith" of Arresting Officers.*

■ The appellant next contends that the search conducted by the I. N. S. agents was unreasonable and violated the Fourth Amendment because the true objective of the arresting officers who conducted the search was to uncover evidence of espionage rather than to discover weapons or evidence of alienage. Cf. Harris v. United States, supra. This contention, vigorously denied by the Government, was rejected by Judge Byers who, at a pre-trial hearing upon appellant's motion to suppress the articles seized, found that the arresting officers in good faith searched Abel's hotel room for the purpose of finding weapons or evidence of alienage. This finding may not be set aside unless, from a survey of the record, we are convinced that it was clearly erroneous. Davis v. United States, 1946, 328 U.S. 582, 66 S.Ct. 1256, 90 L.Ed. 1453. Examination of the record developed at the pre-trial hearing on appellant's motion to suppress demonstrates that there is an adequate foundation to support Judge Byers' finding. To be sure, the I. N. S. first learned of Abel's illegal presence in this country from the F. B. I., but that does not indicate that the I. N. S. search was not made in good faith. Nor does the fact that F. B. I. agents received permission to question Abel prior to his arrest by I. N. S. agents indicate that the I. N. S. agents did not act in good faith. In effect, appellant's attack on the trial judge's finding amounts to an argument that it is absurd to believe that two law enforcement agencies of the Government, both integral parts of the Justice Department, would limit themselves to searching for evidence of alienage when they had more than ample reason to suspect that the inhabitant of the room which they were searching was a high-ranking espionage agent in the employ of a foreign government. We do not deny that such an inference might be drawn from the evidence, but the reasonableness of such an inference is not presently before us. The only question before us is whether the evidence in the record supports the finding of good faith made by the court below. The answer to that question must clearly be in the affirmative.

Noto testified that the interest his Service had in the appellant was confined to the latter's illegal presence in the United States. He further testified the only role played by F. B. I. agents in connection with the arrest was that they provided the I. N. S. with information concerning Abel's illegal status; and that he alone, with no request from

the F. B. I., decided to arrest Abel and to institute deportation proceedings rather than a criminal prosecution. One of the I. N. S. agents who made the arrest testified that he had not received instructions to effect the arrest only if Abel refused to "cooperate" with the F. B. I. and that he had not been instructed to search for evidence of espionage. Both this agent and another I. N. S. officer testified that they were searching for evidence of alienage. Surely we cannot hold that the trial judge was bound to reject this direct evidence of good faith and instead base his finding upon the unsupported and contradicted inference which the appellant urges.

The appellant, by affidavit, sought to sustain his version of the purpose of the search by presenting to the court an article printed in the New York Herald Tribune, under date of August 12, 1957, purportedly setting forth certain statements made by Lieutenant General Joseph M. Swing, Commissioner of the I. N. S.[9]

The article reported that General Swing had stated that the arrest of Abel "was made at the specific request of 'several government agencies' * *" and "that Abel would not have been arrested by immigration officials on June 21 if American counter-intelligence had not requested it." At the very most, the content of this newspaper article if worthy of any court consideration at all only created a conflict in the record which the trial judge was empowered to resolve. Beyond this, however, we see no reason why the trial judge should have credited this multiple hearsay. Not only was the newspaper report itself hearsay, but, on the testimony of Noto, it is clear that General Swing had no first-hand knowledge of the extent of cooperation between the I. N. S. agents and those of the F. B. I.[10]

Moreover, the direct testimony by I. N. S. agents as to the purpose for their search is corroborated by evidence in the record as to the articles seized by them during their search. As we have previously noted, the only articles seized by the I. N. S. agents during their search of the hotel room were (1) the Martin Collins birth certificate, (2) the Emil Goldfus birth certificate, (3) the in-

---

9. The pertinent portions of the article are as follows:

"Spy Hunters Had Eye on Abel a Year

"Arrest Made at Their Request

"By Richard C. Wald

"The immigration authorities' arrest of alleged master spy Rudolph Ivanovich Abel was made at the specific request of 'several government agencies,' it was revealed yesterday by Lt. Gen. Joseph M. Swing, Commissioner of Immigration.

" 'We were well aware of what he was when we picked him up,' Gen. Swing said. 'Our idea at the time was to hold him as long as we could.'

"Gen. Swing indicated that Abel would not have been arrested by Immigration officials on June 21 if American counter-intelligence had not requested it. The commissioner said he could not comment, however, on which agencies provided the information or asked for the arrest. In all cases, it is standard Immigration Service procedure to notify all government intelligence agencies of a pending arrest before it is made, he said. * *"

10. It should be noted that even if the newspaper report of the interview with General Swing were to be credited, then there would only be evidence that the arrest was made at the request of counter-intelligence. This would not be inconsistent with the direct evidence that the search incident to the arrest was conducted solely for the purpose of discovering evidence related to the offense charged in the administrative arrest warrant.

We have related in considerable detail the evidence in the record bearing upon the amount of cooperation between the F. B. I. and the I. N. S. and, also, the extent to which the I. N. S. restricted its activities to performance of its statutory duties. We have done so because in our opinion this evidence bears importantly upon the "good faith" with which the I. N. S. agents conducted the search. It should be clear that we have no intention of suggesting that it would be improper for these two agencies of the Department of Justice to cooperate with each other.

ternational certificate of vaccination in the name of Martin Collins, (4) a bank book issued by the East River Savings Bank to E. R. Goldfus, and (5) several slips of paper which the agents observed Abel trying to secrete in his sleeve. Clearly the seizure of the first four items was wholly consistent with a search conducted to obtain evidence of alienage, for these items were "the instrumentalities and means" by which Abel was able to maintain his illegal status in this country. See Harris v. United States, supra, 331 U.S. at page 154, 67 S.Ct. at page 1103. And the fact that the agents limited themselves to only seizing these articles is convincing evidence that their search was conducted in good faith. The later seizure of the slips of paper by the I. N. S. agents does not reflect adversely on their good faith, for it is undisputed that these slips were taken only after Abel was detected trying to hide them. The agents' good faith obviously was not impugned by their seizure of what the arrested man had tried to hide.

C. *Lawfulness of Seizure.*

■ The appellant contends, however, that even though the search was lawful and even though it was conducted in good faith, the seizure by the I. N. S. agents was unreasonable because the articles seized did not relate to the offense charged in the arrest warrant. We consider this contention only insofar as it pertains to the taking from Abel's person of the papers which he had attempted to hide, for as we have indicated above, with the exception of these papers, everything seized by the I. N. S. agents related to the offense charged in the warrant of arrest. In Harris v. United States, supra, agents of the F. B. I., acting under the authority of two warrants of arrest charging the defendant with mail fraud, went to his apartment and arrested him there. Incident to the arrest they searched the apartment and while they were doing

so discovered and seized eight Notice of Classification cards and eleven Registration Certificates, the possession of which by the defendant was in violation of the Selective Training and Service Act of 1940, 54 Stat. 885, now 50 U. S.C.A.Appendix, § 451 et seq., and of Section 48 of the Criminal Code, 35 Stat. 1098, 18 U.S.C.A. § 641. The defendant was later convicted upon an indictment charging him with unlawful possession, concealment and alteration of the seized articles. The admission into evidence of the seized articles, over objection of the defendant, was upheld by the Supreme Court on the ground that the F. B. I. agents had undertaken the search in good faith for the purpose of discovering evidence concerning the crime charged in the warrant. It is true that in Harris the seized objects were government property unlawfully in the possession of the defendant and that the Supreme Court somewhat relied upon that fact in holding them subject to seizure, see 331 U.S. at page 155, 67 S.Ct. at page 1103, but that circumstance would not appear to be a limiting factor upon the applicability of the Harris decision. Earlier in its opinion the Court had stated that "the objects sought for and those actually discovered were properly subject to seizure." 331 U.S. at page 154, 67 S.Ct. at page 1103. It then went on to differentiate between "merely evidentiary materials * * * which may not be seized * * * and * * * those objects which may validly be seized including the instrumentalities and means by which a crime is committed * * * and property the possession of which is a crime." Thus it appears that the circumstance that the seized articles in the Harris case were government property unlawfully in the possession of the defendant was relevant only insofar as it was necessary to show that because they were such articles they were among the four classes of items properly subject to seizure.[11] Cf. Kelly v. United States, 5

11. The four classes of objects enumerated in Harris as properly subject to seizure during a lawful search are: (1) the instrumentalities and means by which a

Cir., 1952, 197 F.2d 162; United States v. Braggs, 10 Cir., 1951, 189 F.2d 367. Similarly, the papers taken from Abel's person were subject to seizure, for it is clear that they were the "instrumentalities and means" by which he might commit the crime of espionage.

Of course, as Judge Learned Hand has observed in United States v. Poller, 2 Cir. 1930, 43 F.2d 911, at page 914, "[T]he real evil aimed at by the Fourth Amendment is the search itself * *." Since the only proper motive which may impel government agents to conduct searches in connection with an arrest is the desire to obtain information which will be helpful in the prosecution of the crime for which the arrest is made, we well recognize that by placing "limitations upon the fruit to be gathered [from such a search we] tend to limit the quest itself * * *." United States v. Poller, supra, at page 914.

However, in a case such as the present one, where the trial court properly has been convinced that the motivation for the search is the hope of obtaining evidence of the offense for which the arrest is being made, the constitutional prohibition against unreasonable searches is not transgressed; and hence, when, during such a permissible search, articles within the categories enumerated in Harris that were not searched for are in fact discovered no useful purpose would be served by prohibiting seizure of them if they tend to prove the commission of a crime even though the crime be unrelated to the crime for which the arrest is being made. Here, obviously, any limitation we might put upon the use that can be had of articles uncovered by the search would not "tend to limit the quest * * *."

We construe the rule in Harris as not being limited to its own facts or to situations in which the seized objects uncovered in good faith by a not un-

reasonable search happen to be contraband, for there is no valid distinction in holding lawful the seizure of contraband and in holding unlawful seizures of articles which fall within the other categories enumerated in that case. Therefore, we hold that the seizure by I. N. S. agents of the slips of paper which Abel attempted to secrete was not in violation of the Fourth Amendment.

## II. *Sufficiency of the Evidence.*

█ As we have previously indicated, the record contains more than ample evidence to establish that the appellant, while in this country, conspired with others to act on behalf of the Soviet Government. He contends, however, that there is inadequate evidence in the record to support the charges in Counts 1 and 2 of the indictment that the purpose of the conspiracy was to gather and transmit to the U. S. S. R. information relating to the national defense of the United States. In this connection, reliance is placed upon United States v. Heine, supra, in which we reversed a conviction under 50 U.S.C.A. § 34, the predecessor of 18 U.S.C. § 794 (d), because the evidence established that the information communicated by the defendant to the foreign government by whom he was employed was "lawfully accessible to anyone who was willing to take the pains to find, sift and collate it * * *." 151 F.2d at page 815. The appellant contends that there is no evidence in the record which indicates that he ever succeeded in communicating or conspired to communicate any information other than the type which we held could lawfully be sent abroad in the Heine case.

█ It is true that there is no evidence indicating that Abel or his co-conspirators ever succeeded in gathering or in transmitting any unlawful information. There is not the slightest

crime is committed, (2) the fruits of the crime, such as stolen property, (3) weapons by which the escape of the person arrested might be effected, and (4) property the possession of which is a crime. 331 U.S. at page 154, 67 S.Ct. at page 1103.

hint in the record that these espionage agents met with any success. However, appellant was charged with and convicted of having conspired with others in a criminal conspiracy to gather and transmit to the Soviet government secret information pertaining to the national defense of the United States, and the record is abundantly clear that Abel knew of the unlawful purpose of this conspiracy. The conspirators' lack of success, if indeed they were unsuccessful, does not lessen the criminality of their activities. United States v. Rabinowich, supra; United States v. Morello, supra.

Hayhanen was sent to this country by the Soviet government to act as Abel's assistant and for several years he acted in this capacity. During his direct examination he testified as follows:

"Q. Now, let me ask you this directly: What type of information were you seeking? A. Espionage information.

"Q. Would you describe that, what you mean by espionage information? A. By espionage information I mean all information what you can look to get from newspapers or official way, by asking from, I suppose, legally from some office, and I mean by espionage information that kind of information what you have to get illegal way. That is, it is secret information for—

"The Court: Concerning what? What kind of information?

"The Witness: Concerning national security or—

"The Court: What do you mean by that?

"The Witness: In this case United States of America.

"The Court: What do you mean by national security?

"The Witness: I mean it—that some military information or atomic secrets."

The appellant seeks to denigrate this testimony by characterizing it as a "clearly rehearsed statement of a legal conclusion." We do not so understand it. Hayhanen did not merely testify that the purpose of the conspiracy was to obtain "espionage information" or "secret information concerning the national security," but he specifically mentioned obtaining "military information or atomic secrets." His failure to elaborate in more detail concerning the information which the conspirators sought to acquire is readily explainable in light of his prior response to the following question:

"Q. During this conversation or during the receipt of these oral instructions from Pavlov,[12] did he give you any directions as to the type of information? A. Yes, he did.

"He told that it depends what kind of illegal agents I will have, so it depends then what kind of information they can give, where they work or whom they have as friends and such and such things. * * *"

Under these circumstances, it is not surprising that Hayhanen's testimony did not reveal any specific plans for obtaining secret information. His failure to so testify is indicative only of the fact that he had never been successful in his nefarious activities. He did, however, testify to a sequence of events which not only provided additional information tending to prove the purpose of the conspiracy but also tending to prove that Abel was aware of that purpose. This is the testimony relative to the attempts which he and Abel made, under orders from Moscow, to locate Sergeant Rhodes. The reason why Abel had been ordered to locate Rhodes has already been indicated:

12. Pavlov was named in the indictment as a co-conspirator and at the trial was shown to be in charge of the American espionage section of the Soviet State Security Service.

"He [Abel] said that Quebec [Rhodes] could be a good agent because he is—some of his relatives are working on—and he—on military lands.

"He meant Quebec's brother, who was working somewhere—I cannot remember exactly, but in some atomic plant, or what it was."

Surely the jury was justified in inferring from this testimony that Abel and his co-conspirators were interested in establishing contact with Rhodes because of their belief that he was a potential source of secret atomic information.

Moreover, the jury cannot have failed to be impressed by the elaborate precautions taken by the conspirators to keep their activities secret. Men intent upon gathering and transmitting only such information as is available to the general public do not ordinarily find it necessary to employ secret codes; microdots; hollowed-out coins, pencils, or matchbooks; "drops"; and the variety of other devices which Abel and his colleagues used. To be sure, the defendant in Heine had employed devious methods to transmit information which this Court later held might lawfully be transmitted but our reversal of his conviction does not establish that evidence of such devious methods has no probative value. In Heine the information which the defendant had gathered and transmitted was known to the court. No room was left for inference. The present case is quite the contrary. Abel and his co-conspirators—unlike Heine and his—did not, as far as we know, succeed with their plans. Hence, an inference as to their purpose is properly drawn from the methods which they employed. We do not intimate that proof of the methods alone would be sufficient to sustain a conviction. We merely hold that the justifiable inference from the use of such methods by the appellant and his associates, when considered together with the other evidence which we have discussed, was sufficient to justify the jury in finding that the object of the conspiracy in the pres-

ent case was to gather and transmit to the U. S. S. R. information concerning the national defense of the United States which was not "lawfully accessible to anyone who was willing to take the pains to find, sift and collate it  *  *  *"  151 F.2d at page 815.

III. *Admissibility of Rhodes' Testimony.*

██ Roy A. Rhodes, a master sergeant in the United States Army, was called as a witness by the Government, and, insofar as relevant, testified substantially as follows: In 1951, at which time he had been in the Army for nearly a decade, he was assigned to serve as Motor Sergeant at the American Embassy in Moscow. When he arrived in Moscow, in May 1951, he was not accompanied by his family, but in December of that year he received notification that the Soviet government had granted visas to his wife and child and that they would be able to join him. To celebrate this good news, Rhodes had several drinks after lunch and before going back to work. When he returned to work he continued his drinking, now in the company of two Russian nationals who were employed at the Embassy garage apparently as assistants to Rhodes. Late that afternoon the girl friend of one of the Russians came to the garage with a female companion. It was suggested, and Rhodes agreed, that the two women, Rhodes, and one of the Russians employed at the embassy should go out for dinner. The foursome spent the evening together, dancing, drinking and eating. The following morning, according to Rhodes' testimony, he "woke up  *  *  *  in bed with this girl in what I had taken to be her room." He did not see this woman again for several weeks, but then, in response to a telephone call, he arranged a meeting with her. At this meeting he was told that "she has trouble." During the course of this discussion Rhodes and the woman were joined by two men, one of whom was introduced as the woman's brother, and the other as "Bob Day" or "Bob Smith." Rhodes thereafter had quite a number of meetings with Soviet citi-

zens, some of whom were civilians and some of whom were members of the military. At these meetings Rhodes was given varying sums of money by the Russians, totaling between $2500 and $3000, in exchange for information which he gave them. The information for which he was paid concerned, *inter alia,* his duties at the embassy and the personal habits of American military and State Department personnel.

Rhodes also testified that in June 1953 he was transferred from Moscow to San Luis Obispo, California. Prior to his transfer, the fact of which he communicated to Soviet agents, he was given instructions as to how he might contact or be contacted by Soviet agents in the United States. Rhodes then testified that after he returned to this country he did not again have contact with agents

of the Soviet Government. In December 1953 he was transferred from San Luis Obispo to Fort Monmouth, New Jersey, then transferred to Fort Huachaca, Arizona, and then back to Fort Monmouth. During his second tour of duty at Fort Monmouth, Rhodes and his family lived in Eatontown, a town which is almost contiguous with Red Bank.

He also testified that during 1955 his father and his sister, Arlene Brown,[13] lived in Howard, Colorado, a town near Salida, Colorado.[14] Counsel for the appellant strenuously objected to Rhodes' testimony. At the trial, and now on appeal, they contend that his testimony was not relevant to any of the issues raised during the trial and that insofar as it contained a recitation of crimes in which the appellant was never shown to have participated, it was highly prejudicial to

13. Arlene Brown was called as a witness by the Government. She testified that in the spring of 1955 she received a telephone call concerning her brother from a man who spoke with a very heavy accent.

14. Prior to the trial Rhodes had given statements concerning his activities in Moscow to the F. B. I. and to the Department of the Army. Both of these statements, in their entirety, were made available by the Government to counsel for the defense. Examination of the statements by defense counsel revealed a discrepancy as to one important particular in the two statements. However, as this discrepancy related to a matter which the Department of the Army considered classified information, Rhodes was not questioned about it on either direct or cross-examination. Instead, appellant's counsel and counsel for the Government stipulated that the trial judge should inform the jury that a contradiction as to this one particular existed between the two statements. Accordingly, prior to cross-examination of Rhodes, the judge stated to the jury:

"Members of the jury, as you probably realize, when we took a recess it was for the purpose of a consultation between the Court, counsel for both sides, and other representatives of the United States Government.

"As the result of that conference, it was brought to light that the witness Rhodes gave certain statements to the Army and to the F. B. I. during the

month of June, 1957 and, I think, July and perhaps later.

"Those statements were the basis of the consultation.

"At the end of the discussion, which was quite informal, the United States concedes with respect to one item referred to in those statements this witness has made conflicting statements.

"The subject matter involved was not brought out on his direct testimony because, in the opinion of the Government, it would not have been in the interests of national security for that subject to have been inquired into.

"The conflict pertained to his version of his activities in Moscow, and an important incident which there occurred.

"Both counsel have agreed that since this concession is before the jury, namely the concession that the witness has made conflicting statements, the witness has been to this extent discredited. Such is the purpose of cross-examination.

"Counsel for both sides have agreed that no useful purpose would be served by pursuing the subject further."

The statements made by Rhodes to the Army and to the F. B. I. have been made available to this court, in their entirety, and have been examined by us. In our opinion, the trial judge's statement to the jury accurately reflected the substance of the discrepancy between the two statements, and the rights of the appellant were in no way prejudiced by the withholding from the jury of the subject matter of this discrepancy.

appellant. The Government, on the other hand, contends that Rhodes' testimony was admissible as tending to corroborate Hayhanen's testimony concerning the efforts made by him and Abel to locate Rhodes. It was upon this theory that the trial judge admitted the testimony.

The issue is not so much one of law as it is one of logic. The question to be answered is whether as a result of Rhodes' testimony we, or the jury, know more about the circumstances of this case than would have been known if the testimony had been excluded. We think it clear that the answer to that question must be stated in the affirmative. Hence we conclude that Rhodes was properly permitted to testify.

To be sure, Abel was not chargeable with responsibility for Rhodes' activities while the latter was in Moscow; but the fact that Rhodes had engaged in those activities, that he had notified Soviet agents of his transfer to the United States, and that arrangements were made whereby Rhodes and Soviet agents could contact one another in this country, lent credence to the testimony of Hayhanen that he and Abel, both agents of the Soviet Government, had received instructions to locate Rhodes and that they had made efforts to do so. Phrased somewhat differently, the effect of Rhodes' testimony was to better enable the jury to pass upon the credibility of a material portion of the testimony of Hayhanen. The jury determination as to whether Hayhanen spoke truthfully or falsely about the instructions he had received and the efforts made by him and Abel to locate Rhodes was materially aided by testimony tending to show that a strong motive existed to locate the latter. Rhodes' testimony provided that motive.

It should be borne in mind that this is not a case in which there has been an attempt to create an aura of credibility with respect to the testimony of an accomplice witness by introducing independent corroborative evidence of minor matters to which the accomplice testified. See People v. Nitzberg, 1941, 287 N.Y.

183, 38 N.E.2d 490, 138 A.L.R. 1253; Commonwealth v. Holmes, 1879, 127 Mass. 424; but cf. Hoback v. United States, 4 Cir., 1924, 296 F. 5, certiorari denied, 265 U.S. 594, 44 S.Ct. 638, 68 L.Ed. 1197; United States v. Biebusch, C.C.E.D.Mo.1880, 1 F. 213; Aycock v. State, 1940, 62 Ga.App. 812, 10 S.E.2d 84; Ettinger v. Commonwealth, 1881, 98 Pa. 338. Rhodes' testimony tended to prove the truth of Hayhanen's testimony, not because it tended to confirm some of the details of the latter, but because the circumstances which Rhodes related made it more likely that Rhodes was, as Hayhanen had testified, being sought by foreign espionage agents.

IV. *Alleged Deprivation of a Fair Trial.*

The final ground for reversal urged by the appellant is that during the trial a variety of minor errors occurred which, cumulatively, had the effect of depriving him of a fair trial. A careful perusal of the record indicates that this contention is unfounded. Although occasional error did occur at the trial—indeed, it would be somewhat surprising not to find minor error in the course of a trial lasting approximately two weeks—we cannot find that the appellant was injured thereby.

The most important of these errors complained of by the appellant is the refusal of the trial judge to grant two motions, one made prior to trial and one at the close of the Government's evidence, to strike as surplusage a recital in the tenth paragraph of both the first and second counts of the indictment that it was a part of the conspiracy charged that Abel and his co-conspirators "would engage in acts of sabotage against the United States." See Rule 7(d) Fed. Rules Crim.Proc., 18 U.S.C. Even though we agree with the appellant that the reference to sabotage was surplusage, we are unable to see how that reference could have been prejudicial to his interests. As appellant points out, "sabotage," unlike the crime of "espionage" charged in the indictment, connotes violence and destruction and hence might tend to inflame the jury; but there was

no testimony in the case concerning sabotage or a conspiracy to commit sabotage, and the jury was carefully instructed by the trial judge that the indictment was not evidence and was not to be considered by them as evidence. Under these circumstances, we think that the failure of the trial judge to grant the motions to strike was such insubstantial error that it falls within the injunction of Rule 52(a), Fed.Rules Crim.Proc. Cf. Catrino v. United States, 9 Cir., 1949, 176 F.2d 884.

The appellant also alleges that a series of errors occurred during the examination of witnesses—particularly during the examination of Hayhanen. Thus, it is contended that Hayhanen was continuously led by the prosecutor, that the conversations with Abel to which Hayhanen testified were needlessly vague, and that a variety of improper questions were put to him. No purpose would be served by a detailed discussion of these alleged improprieties. As to some we do not find that any error was committed; others were matters within the discretion of the trial judge, who, in our opinion, did not abuse that discretion; and as to the remainder we think that the alleged errors were not so prejudicial as to require a new trial in this case where the "record fairly shrieks the guilt" of the accused. Lutwak v. United States, 1953, 344 U.S. 604, 619, 73 S.Ct. 481, 490, 97 L.Ed. 593.

Subsequent to his indictment the appellant requested the district court to appoint counsel for him, to be recommended by the local bar association. In accordance with this request, the district court appointed James B. Donovan as chief defense counsel. Arnold Guy Fraiman was subsequently appointed as associate defense counsel. Both at the trial and on this appeal these attorneys, together with Thomas M. Debevoise, II, who assisted them, have represented the appellant with rare ability and in the highest tradition of their profession. We are truly grateful to them for the services which they have rendered.

Affirmed.